# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **BRENDA G. BLEVINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 2:02-0016** |
| **v.** | ) | **Judge Nixon / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 22. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 25.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

1

Plaintiff filed her initial application for DIB on December 7, 1993, alleging disability since February 15, 1991, due to arthritis, back and leg pain, and breast cancer. *See, e.g.,* Docket Entry No. 20, Attachment ("TR"), pp. 530.[1]  Plaintiff's initial application was denied, and there is no indication in the record that Plaintiff sought reconsideration of this denial.  TR 476-477.

Plaintiff subsequently filed another application for DIB on July 26, 1994 (TR 491-493), alleging disability beginning February 15, 1991 (TR 491), due to a "cracked disc" in her back, arthritis in her fingers and legs, breast cancer, and migraines (TR 520).  This application was denied both initially (TR 494-495), and upon reconsideration (TR 506-513).  There is no indication in the record that Plaintiff appealed these denials.

Plaintiff next filed applications for both DIB (TR 57-59) and SSI (TR 362-364) on June 20, 1996, alleging disability beginning on April 2, 1990, due to "disorder of the back" and obesity.[2]  These applications were also denied (TR 30-35; 365-366) and there is no indication in the record that Plaintiff sought reconsideration of these denials.[3]

Plaintiff filed her current applications for both DIB and SSI[4] (TR 373-376), on April 8,

---

[1]The Administrative Record in the case at bar is compiled in two volumes, both of which were filed on August 30, 2002.  Docket Entry Nos. 19 and 20.  There is consecutive pagination between volumes one and two: "TR" citations ranging from 1 to 469 reference the first volume, while citations from 470 to 629 reference the second volume.  Two copies of the first volume (Docket Entry No. 19) have been submitted to the Court, and the only apparent difference between the two copies is that one has a table of contents with page numbers.  All "TR" citations in this Report and Recommendation reference the copy of the first volume that contains page numbers.

[2]Plaintiff also alleged disability due to breast cancer, leg pain, back pain, and arthritis.  TR 76.

[3]The disability determination on TR 30-35 is duplicated at TR 367-372.

[4]The Administrative Record before this Court does not contain Plaintiff's current application for DIB, nor does it contain the initial denial or reconsideration report for that

2

1998, alleging disability since January 3, 1994, due to neck, back, and leg pain (TR 70-75).[5]

Plaintiff's applications were denied both initially (TR 377-379) and upon reconsideration (TR 380-381).

Plaintiff subsequently requested (TR 42-43) and received (TR 24-25; 44-46) a hearing. Plaintiff's hearing was conducted on January 11, 1999, by Administrative Law Judge ("ALJ") Harry G. Nichol, Jr. TR 445-469. Plaintiff and vocational expert ("VE"), Patsy Bramlett, appeared and testified.[6] TR 445. The ALJ did not close the record after the hearing, however, because Plaintiff's counsel requested an opportunity to collect and review prior files. TR 468. A second portion of Plaintiff's hearing was held on December 2, 1999, and was conducted by ALJ Donald E. Garrison. TR 409-444. Plaintiff and VE, Rebecca Williams, appeared and testified. *Id.*

---

application. The ALJ, in his decision issued on March 29, 2000, however, noted that Plaintiff had applied for both DIB and SSI. *See* TR 16. Apparently, a previous disability determination indicated that Plaintiff was not eligible for DIB benefits under her initial alleged disability date. *See* TR 26-27. Accordingly, during her hearing, Plaintiff's attorney amended her disability onset date to January 1984, and Plaintiff became eligible for DIB benefits. TR 412.

[5]Plaintiff filed a Reconsideration Disability Report on July 6, 1998 as an amendment to her April 8, 1998 claim, alleging that she had a new condition, namely, a tumor in her right breast. TR 100-103. Additionally, Plaintiff's Disability Report lists the alleged onset of disability date as September 1, 1996 (TR 70; 84), but Plaintiff's attorney, at the December 1999 hearing, amended the alleged onset of disability date to January 3, 1994 (TR 412).

The Court notes that although the table of contents lists April 8, 1997 as the filing date for Plaintiff's Disability Report (TR 3), this appears to be a typographical error as the report itself contains entries after 1997 (TR 71), the hearing record notes April 8, 1998 as the filing date (TR 16), and a supplemental record entitled "Disability Report - Field Office" (TR 84-87) is dated April 8, 1998.

[6]The VE's name is Patsy Bramlett, according to her curriculum vitae (TR 48-50), the letter requesting her testimony at Plaintiff's hearing (TR 47), and the table of contents (TR 3). The VE's name is misspelled as Patsy Branlett on the cover page of the hearing (TR 445), and within the hearing (TR 465).

On March 29, 2000, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR

13-23.  Specifically, the ALJ made the following findings of fact:

1.　The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through September 30, 1995.

2.　The claimant has not engaged in any substantial gainful activity since the alleged onset of disability.

3.　The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920.(b).

4.　These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.　The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.　The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.　The claimant has the following residual functional capacity: light exertional level with occasional postural activities, a mild loss of ability to sustain concentration, persistence, and pace due to pain, and illiterate.

8.　The claimant is unable to perform any of her past relevant work, per vocational expert testimony (20 CFR §§ 404.1545 and 416.965)

9.　The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

4

10. The claimant has "a limited education" - illiterate (20 CFR §§ 404.1564 and 416.964).

11. The claimant's past relevant work was unskilled. Therefore she has no transferable skills. (20 CFR §§ 404.1568 and 416.968).

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decisionmaking, there are a significant number of jobs in the national economy which she could perform. Examples of such jobs include work as assembler (1,200 jobs) at the light level of exertion; and assembler (4,000 jobs), parts sorter (400 jobs), and inspector (500 jobs) at the sedentary level of exertion within the State of Tennessee regional economy.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

TR 22-23.

On April 18, 2000, Plaintiff timely filed a request for review of the hearing decision. TR 11. On February 6, 2002, the Appeals Council issued a letter declining to review the case (TR 7-8), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

5

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability beginning January 3, 1994, due to neck, back, and leg pain.[7]
TR 16, 70-71.  Plaintiff alleges that she was involved in a motor vehicle accident in January
1998, which caused her back pain to worsen and to extend to her neck and shoulder.  TR 18.  In
addition to her back and leg pain, Plaintiff alleges disability due to pain the neck and shoulder,
numbness in her left leg and hip, headaches, and nerves.  *Id.*

On October 15, 1990, Dr. Jonathan Allred treated Plaintiff for pain in her back and leg.
TR 219.[8]  Dr. Allred ordered a CT scan of Plaintiff's lumbar spine and an x-ray of her thoracic
and lumbar spine, the results of which indicated "[s]ymptoms of a ruptured lumbar disc."  TR
219.  Dr. Allred prescribed "Mag tabs SR x 3 months supply."  *Id.*

On February 8, 1992, Dr. Allred treated Plaintiff for a forearm injury.  TR 218-219.  Dr.
Allred ordered an x-ray, which revealed "normal" results.  TR 218.  Dr. Allred prescribed "Apap
500mg."  *Id.*

On April 20, 1992, Dr. R.L. Carroll, Jr. treated Plaintiff for a "mass" in her left breast.

---

[7]In his decision, the ALJ stated that Plaintiff's alleged, disabling conditions were leg and
back pain.  TR 16.  The ALJ also noted Plaintiff's other allegations of disability: pain in her neck
and shoulder, numbness in the leg and hip, headaches, and nerves.  TR 18.  Plaintiff's Brief
alleged that Plaintiff's disabling conditions included arthritis, migraine headaches, depression,
and illiteracy.  Docket Entry No. 23.

[8]The table of contents in the Administrative Record indicates that Dr. Allred's medical
records contained therein date from February 8, 1992 to August 28, 1996.  TR 4.  The earliest
record from Dr. Allred contained in the Administrative Record, however, dates from September
14, 1987.  TR 219.  Additionally, several records are duplicates: TR 213-217 are identical to TR
600-603, 605; TR 222-223 are identical to TR 604, 606; and TR 218, 220, 219, 221 are the same
as TR 608, 607, 609-610.  TR 212 contains the same information as TR 599, but also contains
updated information from subsequent visits.

Case 2:02-cv-00016   Document 28   Filed 04/12/06   Page 6 of 41 PageID #: 8

TR 564-565.[9]  Upon physical examination, Dr. Carroll found that Plaintiff had a "3 by 4 cm mass

in the upper outer quadrant of her left breast towards the midline."  TR 564.  Plaintiff underwent

a mammogram, which revealed a "dominant density in the left breast that seems to be well

defined maybe a cyst but I cannot rule out something more significant."  TR 565.  Dr. Carroll

recommended that Plaintiff return for another mammogram.  TR 564.

From April 28, 1992 to December 2, 1993, Dr. Christopher M. Bell treated Plaintiff for

conditions related to her breast mass.  TR 138-148.[10]  Dr. Bell performed an "excisional biopsy"

on Plaintiff's left breast (TR 143), which revealed "fibroadenoma with a phyllodes tumor" (TR

142).[11]

On July 16, 1992, Dr. Bell treated Plaintiff for complaints of difficulty losing weight and

lethargy.  TR 144.  Dr. Bell performed a physical examination, which revealed "no definite

masses or goiter" (TR 141), and he ordered testing for thyroid problems, which revealed no

---

[9]Plaintiff received treatment at the Cumberland Medical Center from April 24, 1990 to
November 30, 1993.  TR 116-137.  This treatment included mammograms of Plaintiff's left
breast mass, as well as follow-up visits for mammographies and related examinations.  TR 116-
123.

Other records include the following: laboratory reports (TR 136-137) related to a
pregnancy test (TR 132-134); an emergency room ("ER") visit for abdominal pain, for which the
date is unclear (TR 131); a "routine sterilization" (TR 124-130); and another series of
mammographies for the mass in Plaintiff's left breast (TR 116-123).

The following pages are duplicates between the two volumes of the record: TR 116-117
at TR 567, 569; TR 120 at TR 570; TR 122-123 at TR 571, 573; and TR 116-123 at TR 577-578,
580, 566, and 568.

[10]The following records are duplicates between the two volumes of the record: TR 138-
143 at TR 576, 579, 581-582, 587-588; TR 147 at TR 586; and TR 144 at TR 585.  The
following records are also duplicates between the two records, except for the orientation of the
paper: TR 145-146 at TR 583-584; and TR 148 at TR 589.

[11]The record contains laboratory reports (148), pathology reports (TR 147), and reports
from Plaintiff's follow-up visits for her biopsy (TR 138-143).

7

abnormalities (TR 144-146).

On August 28, 1992, Dr. Allred treated Plaintiff for complaints of headaches ("HA"), pain across her shoulders, pain in her left, "supra-mammary area," and "tightness" across her chest. TR 216. Dr. Allred examined Plaintiff, finding that she had a "right frontal headache which radiates around the right side to the occipital region and down the right neck and out to the right shoulder." *Id.* Dr. Allred assessed Plaintiff's conditions as "tension HA," "chest wall pain," and "musculoskeletal strain." TR 215.

On September 30, 1992, Dr. Bell treated Plaintiff for numbness in the left arm and fingers. TR 141. Dr. Bell's physical examination of Plaintiff revealed that she had a scar on her left breast, but "[n]o dominant masses, no tenderness." *Id.* Dr. Bell ordered an EKG, which revealed "sinus arrhythmia," and a chest x-ray, which revealed "no infiltreates or lesions." *Id.* Dr. Bell hypothesized that Plaintiff's numbness could indicate "early carpal tunnel syndrome."[12] TR 140.

On September 21, 1992, Dr. Allred treated Plaintiff for a "tingling sensation in her left arm and hand." TR 215. Upon physical examination, Dr. Allred noted that Plaintiff had "some decreased sensation on the forearm area and also on the hand on the left compared to the right." *Id.* Dr. Allred prescribed Motrin, and stated that he would "consider blood testing and possible EMG in the future." *Id.*

On May 14, 1993, Dr. Allred recorded Plaintiff's complaint of "HA x 3 days." TR 212-213. Dr. Allred's physical examination revealed that Plaintiff's neck was "[s]upple w/o masses,

_____

[12]Dr. Bell also saw Plaintiff for follow-up appointments after the removal of her left breast tumor. TR 138-140.

nodes," and that her lungs were "clear." TR 212. Dr. Allred assessed, "HA, probable tension/stress," and prescribed Motrin, rest, and heat for the pain. *Id.*

On September 20, 1993, Dr. Allred treated Plaintiff for pain on her right side. TR 302-305. Dr. Allred ordered an ultrasound of Plaintiff's gallbladder, and a "Biphasic Upper GI," both of which returned normal results. Dr. Allred's impression was that Plaintiff had "minimal antral gastritis." TR 301.

On November 8, 1993, Dr. Jack Smith treated Plaintiff for complaints of pain in her left leg, and her complaint that her back "hurts when breathing." TR 191; 337. Upon physical examination, Dr. Smith found "some swelling of the left knee," and "moderate tenderness in the muscles of the upper back on the left side." TR 326. Dr. Smith assessed Plaintiff's conditions as: "[o]besity," "[a]rthritis," and "[m]ytosis of left knee." *Id.* Dr. Smith prescribed Kenalog and Clinoril. *Id.*

On December 16, 1993, Dr. Allred completed a "Medical Assessment of Ability to Do Work-Related Activities" form regarding Plaintiff, on which he marked "cannot assess" for each of the form's designated criteria. TR 597-598. Several days later, on December 21, 1993, Dr. Allred completed another "Medical Assessment of Ability to Do Work-Related Activities," and asserted that Plaintiff had "no impairment-related physical limitations." TR 595-596.

On January 3, 1994, Dr. Smith treated Plaintiff for back pain. TR 325. Dr. Smith ordered a series of tests, including an x-ray of Plaintiff's lumbar spine.[13] TR 188-189. Dr. Smith

_____

[13]The results of a "Biphasic Upper GI" and an ultrasound of the gallbladder revealed "normal" results. TR 190. There is a poor-quality copy of this record at TR 300. The ultrasound was conducted at Fentress County General Hospital. *Id.* The record contains two sets of medical reports from Fentress County General Hospital: one set covers Plaintiff's treatment from January 3, 1994 to April 24, 1996 (TR 149-191), and the second set covers treatment from September 20, 1993 to March 19, 1998 (TR 237-305).

9

found that Plaintiff's "[b]ony structures and curvature and alignment" were normal, and noted "[b]orderline thinning of L5 disc space." TR 190, 300. Dr. Smith diagnosed Plaintiff with "[b]ack strain." TR 325.

On January 25, 1994, Dr. Allred conducted a physical examination of Plaintiff on behalf of the Department of Human Services ("DHS"). TR 211, 591. Dr. Allred recounted Plaintiff's history of arthritis in the back and left leg, which "occasionally" presented in her neck and left shoulder. TR 211. Dr. Allred also reported that Plaintiff claimed to have experienced this pain since her 1973 motor vehicle accident ("MVA"). *Id.* Dr. Allred noted Plaintiff's statements that she could not walk or stand for any significant period of time, and that she could not lift any significant weight. *Id.* Additionally, Dr. Allred noted that Plaintiff asserted that she experienced headaches, as well as pain in her back, left leg, shoulder, elbows, wrists, and fingers. *Id.* Dr. Allred found that Plaintiff was obese, and he noted "decreased ROM" in Plaintiff's left shoulder, left knee, and back, as well as "mild swelling" in the "medial aspect of the left knee." *Id.* Dr. Allred's assessment was that Plaintiff had arthritis in the left hip and knee, and that she experienced back pain "most consistent with LS strain."[14] *Id.* Dr. Allred stated that the "[p]rognosis of this may improve with correct management, but this is probably a life long process." *Id.*

In February 1994, Dr. George W. Bounds completed Plaintiff's first Residual Functional Capacity Assessment ("RFC").[15] TR 478-485. Dr. Bounds opined that Plaintiff could

---

[14]Dr. Allred hypothesized further about Plaintiff's back pain: "[c]annot R/O some degenerative arthritis disease versus ? mild HNP, but no evidence of a neurological defect." TR 211.

[15]The date on the first page of the form appears to be November 22, 1993 (TR 478), but the date next to the signature on the back of the form appears to be February 1994 (TR 485).

10

"[o]ccasionally" "lift and/or carry" 50 pounds; "[f]requently" "lift and/or carry" 25 pounds; "[s]tand and/or walk" for "about six hours in an eight-hour workday"; and sit for "about six hours in an eight-hour workday." TR 479. Dr. Bounds determined that Plaintiff's abilities to "[p]ush and/or pull" were unlimited, and that Plaintiff had no postural, visual, communicative, or environmental limitations. TR 479-482. Additionally, Dr. Bounds found that Plaintiff had no manipulative limitations, except that she had the ability to reach overhead with the left arm only "[f]requently." TR 481.

On June 1, 1994, Dr. Smith treated Plaintiff for left leg pain and back pain. TR 324; 336. Upon physical examination of Plaintiff's legs, Dr. Smith found, "[p]ositive straight leg raise on the left" and "[n]egative on the right." TR 324. Dr. Smith diagnosed Plaintiff with "[b]ulge in lumbar disc" and "[o]besity." *Id.* Dr. Smith recommended that Plaintiff lose weight. *Id.*

On July 27, 1994, Dr. James B. Millis completed Plaintiff's second RFC. TR 496-503. Dr. Millis opined that Plaintiff could "[o]ccasionally" "lift and/or carry" 20 pounds; "[f]requently" "lift and/or carry" 10 pounds; "[s]tand and/or walk" for "at least two hours in an 8-hour workday"; sit for "about six hours in an eight-hour workday"; and "[p]ush and/or pull" without limitation. TR 497. Dr. Millis found that Plaintiff could perform all of the postural activities "[f]requently," and that Plaintiff could "[f]requently" reach overhead with her left arm, but had no other manipulative limitations.[16] TR 498-499.

On October 5, 1994, Dr. Sven Spjuth evaluated Plaintiff on behalf of the Tennessee Disability Determination Services ("DDS"). TR 612-618. Dr. Spjuth recorded that Plaintiff

_____

[16]A "Vocational Specialist Comments - 4" form, also from July 27, 1994, is included in the record, and indicates that Plaintiff had an "exertional RFC" for "sedentary work." TR 504. There is no signature on this form. TR 504.

Case 2:02-cv-00016   Document 28   Filed 04/12/06   Page 11 of 41 PageID #: 13

alleged pain in her back and joints "that prevents her from doing any type of work or physical activity." TR 612. Dr. Spjuth documented Plaintiff's "disc degeneration in the lower back," and observed her difficulty moving around the examination room and sitting on the table, as well as her difficulty walking from the parking lot to the doctor's office when she was "not observed." TR 612-613. Dr. Spjuth found that Plaintiff had "poor movement of the arms," and documented her statements that she could not lift more than five pounds or brush her teeth without experiencing pain in her shoulder. TR 612. Dr. Spjuth also noted that Plaintiff's scar from her breast surgery was "very tender." TR 613. Upon physical examination, Dr. Spjuth stated that Plaintiff "seems all the time having [*sic*] a very low pain threshold." *Id.* He found that Plaintiff had "some restrictions in the neck," "lumbosacral spine," shoulder, and hip. TR 614. Dr. Spjuth observed a "clear enlargement of the knees as is typical for osteoarthritis." *Id.* Dr. Spjuth characterized Plaintiff's other joints as "normal." *Id.* He summarized Plaintiff's condition as "[s]pondylosis lumbosacral and cervical spine, [o]steoarthritis knee, hips, and shoulders, and [m]ixed headache." TR 615.

Also on October 5, 1994, Dr. Spjuth completed a "Medical Assessment of Ability to Do Work-Related Activities" regarding Plaintiff. TR 616-617. He indicated that Plaintiff had "no impairment-related physical limitations." TR 617. Dr. Spjuth opined that Plaintiff could "[o]ccasionally lift and/or carry" less than 10 pounds; "[f]requently lift and/or carry" less than 10 pounds; "[s]tand and/or walk (with normal breaks) for a total of" "less than 2 hours in an 8-hour workday"; or "[s]it (with normal breaks) for a total of" "less than about 6 hours in an 8-hour workday." *Id.*

On December 2, 1994, Dr. Smith treated Plaintiff for complaints of shoulder pain. TR

323.  Upon physical examination, Dr. Smith found that Plaintiff had left shoulder pain and breast "mastitis."  *Id.*  Dr. Smith "[i]njected" Plaintiff's shoulder "Xylocaine and Kenalog," and prescribed "Axis 150, 1 bid."  TR 323.[17]

On February 24, 1995, Dr. Melvin J. Blevins consulted with Plaintiff on behalf of DDS. TR 624-629.  Dr. Blevins recounted Plaintiff's pain following her 1973 MVA.  TR 624.  He reported that Plaintiff complained of "constant throbbing pain" in her left shoulder; "[c]onstant pain and swelling in her left knee"; and "constant low back pain which radiates to both legs with intermittent numbness in both legs."  *Id.*  Upon physical examination, Dr. Blevins found "paralumbar tenderness" in Plaintiff's back, "mild restricted bursitis of the left shoulder," and "puffiness and evidence of osteoarthritic changes of the left knee."  TR 625.  Dr. Blevins' impressions were: "[s]tatus post injuries as described," "[c]hronic lumbosacral strain," and "[b]ursitis left shoulder."  *Id.*  Dr. Blevins also indicated Plaintiff's range of motion limitations on charts.  TR 628-629.

On February 28, 1995, Dr. Blevins completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" form regarding Plaintiff.  TR 626-627.  Dr. Blevins indicated that Plaintiff could "[o]ccasionally lift and/or carry" 25 pounds, but marked "cannot assess" for her ability to perform frequent lifting.  TR 626.  Dr. Blevins also indicated that Plaintiff could "[s]tand and/or walk" for "at least 2 hours in an eight-hour workday," and could sit for "about 6 hours in an 8-hour workday."  TR 627.

---

[17]The second volume of the record includes a section from Dr. Smith's records (TR 619-623) that duplicates information contained in the first volume.  The records in the second volume are less complete, however, because they come from an earlier disability determination.  For example, TR 323 is an updated version of TR 619.  None of the information is updated or changed in the following pairs of records: TR 324, 620; TR 326, 622; TR 327, 621; TR 328, 623.

On May 3, 1995, Dr. Smith treated Plaintiff for complaints of stomach problems and nausea. TR 176-177. Upon physical examination, Dr. Smith found that Plaintiff had "epigastric tenderness" and "heartburn." TR 177. Dr. Smith ordered an "ultrasound of GB," which revealed no abnormalities. TR 173-175.[18] Dr. Smith prescribed Phenergan. *Id.*

On June 30, 1995, Dr. Charles Adams treated Plaintiff for an injury to her left knee and ankle that she sustained when she "slipped." TR 170-171. Dr. Adams ordered an x-ray, which revealed "minimal soft tissue swelling" in Plaintiff's left ankle, but no fractures or "abnormality" in Plaintiff's left foot or left knee. TR 172; 296.

On December 29, 1995, Dr. Smith treated Plaintiff for a complaint of "[p]ain in [the] entire back." TR 323. Dr. Smith's physical examination revealed that Plaintiff's back was "[t]ender to deep palpation," and that she was "crying during [her] visit." *Id.* Dr. Smith diagnosed Plaintiff with "back pain, severe depression/tension, obesity, myalgia," and he prescribed Kenalog, Naprosyn, Trazedone, and Atarax. *Id.*

On December 30, 1995, Dr. Smith treated Plaintiff for back pain. TR 162-163. Dr. Smith ordered x-rays, which revealed "[m]ild narrowing of L5 disc with vacuum disc phenomenon and end plate sclerosis," and "[v]ertebral body heights and alignment within normal limits." TR 164-166; 293-294. Dr. Smith summarized the results as indicating, "[m]oderate changes of degenerative disc disease at L5." TR 164.

On February 15, 1996, Plaintiff visited Dr. Smith with complaints of nausea. TR 322. The following day, Dr. Smith treated Plaintiff for an "ulcer v. h[iatal] hernia." TR 158-159. Dr. Smith ordered laboratory reports, a gallbladder ultrasound, and a "Biphasic Upper GI"

---

[18]There are duplicates of the ultrasound. TR 185; 297; 323.

ultrasound, the third of which revealed, a "small diverticulum in third portion of duodenum with no other definite abnormality." TR 160; 290.[19]

On March 12, 1996 and March 25, 1996, Dr. Smith treated Plaintiff for pain in her toe. TR 322.[20] Dr. Smith ordered an x-ray of Plaintiff's toes on April 1, 1996, which revealed an "acute fracture of proximal phalanx of 3rd toe." TR 152-153; 287; 322. Dr. Smith suggested that Plaintiff take Tylenol for the pain. TR 322.

On April 21, 1996, upon referral from Dr. Smith, Dr. Stanley L. Bise treated Plaintiff for headaches and dizziness. TR 192. Upon physical examination, Dr. Bise found that Plaintiff had an "asymptomatic right septal deviation." *Id.* Dr. Bise characterized Plaintiff's headaches and dizziness as "muscle/tension headaches" and "[l]abyrinthine benign positional vertigo," respectively. *Id.* Dr. Bise prescribed Naprosyn and Robaxin. TR 284-285.

On April 22, 1996, Dr. Mark A. Clapp treated Plaintiff for complaints of a "weird feeling all day," nausea, and dizziness.[21] TR 149-150. Dr. Clapp suggested that Plaintiff was experiencing "[l]abyrinthitis-type symptoms." TR 151.

On August 13, 1996, Dr. Edward D. Johnson consulted with Plaintiff on behalf of DDS.[22] TR 193. Dr. Johnson summarized Plaintiff's disability complaints as: lumbar pain, left leg pain, arthritis, left breast tumor, hypertension, and chest pain. *Id.* Dr. Johnson also noted Plaintiff's

---

[19]The record contains three copies of a February 20, 1996 x-ray. TR 157; 288; 289.

[20]The nursing assessment from March 25, 1996, noted a "great deal of pain in the left foot and leg." TR 334.

[21]Dr. Clapp is an associate of Dr. Smith and Dr. Heikkenen. TR 448. Dr. Clapp did not sign this record. TR 286.

[22]Dr. Johnson conducted the examination on August 13, 1996, but composed the letter reporting his findings on August 19, 1996. TR 193.

15

1973 MVA during which she injured her "lumbosacral spine and left leg." *Id.* Purportedly, as a result of this accident, Plaintiff experienced "constant lumbar pain with radiation down the entire left leg" which worsened with sitting or prolonged standing. TR 193-194. Plaintiff also reported pain and stiffness in both hands, decreased grip, and "aching" throughout her body. TR 194. She further reported a "tight, squeezing pressure in the left breast area with radiation into the left arm" which worsened with activity. *Id.* Dr. Johnson found that Plaintiff had "full range of motion" in her cervical spine and in her extremities. TR 195. Dr. Johnson's impression of Plaintiff's lumbosacral spine was that she had a "complete absence of the L5-S1 disc space" from "congenital absence" or trauma. TR 196. Based upon the examination, Dr. Johnson concluded that Plaintiff "should be able to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds and sit, stand and walk for 6 hour intervals." *Id.*

On August 21, 1996, Plaintiff underwent an RFC (Physical) assessment.[23] TR 202-208. The RFC indicated that Plaintiff could "[o]ccasionally" "lift and/or carry" 20 pounds; "[f]requently" "lift and/or carry" 25 pounds; "[s]tand and/or walk" for "about 6 hours in an 8-hour workday"; sit for "about 6 hours in an 8-hour workday; and "[p]ush and/or pull" without limitation. TR 202. Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. TR 203-205.

On February 3, 1997, Jarell F. Killian, M.S., conducted a psychological evaluation of Plaintiff on behalf of DHS that was co-signed by Dr. William K. Sewell, PhD. TR 339-342. Mr. Killian reported that Plaintiff stated that she was disabled because of her "bad back," bleeding ulcers, migraines, and "nerves." TR 339. Mr. Killian recorded that Plaintiff had a "Verbal I.Q."

---

[23]The signature and stamp on the RFC are illegible. TR 208.

of 80, a "Performance I.Q." of 86, and a "Full Scale I.Q." of 83, as well as "very weak academic skills." TR 341. Mr. Killian administered the "Wechsler Adult Intelligence Scale - Revised," upon which Plaintiff scored "4.3" and "4.0," respectively, on reading and mathematics tests, scores that are "considered handicap level for vocational purposes." TR 341. Mr. Killian noted that Plaintiff "exhibited no signs of physical or emotional distress during this session" (TR 342), and that she "seemed to attempt an honest presentation" (TR 339). Mr. Killian's diagnostic impression was that Plaintiff had "Depressive Disorder NOS," "Developmental Reading Disorder," and "Developmental Mathematics Disorder." TR 342.

On April 18, 1997, Dr. Dale Perigan noted Plaintiff's "weakness in both hands that is reminiscent of Carpal Tunnel." TR 197. Dr. Perigan prescribed "nonsteroidal anti-inflammatory agents" and scheduled a follow-up appointment for six weeks later. *Id.*

On June 3, 1997, Plaintiff was scheduled to have a DHS physical with Dr. Allred to address her chest pain, but because Plaintiff complained of back pain, chest pain, left arm pain, mild tingling in the arm, and nausea, Dr. Allred referred Plaintiff back to Dr. Smith and postponed her DHS physical. TR 210.

On August 28, 1997, Dr. Allred conducted Plaintiff's DHS physical. TR 209. Dr. Allred reported that Plaintiff had been experiencing back pain since an MVA in 1973, which was "radiating down both hips and down both legs w/ some associated tingling/numbness intermittently but not persistent [*sic*]." *Id.* Dr. Allred documented "decreased ROM" in Plaintiff's extremities and "decreased ROM in all directions, especially flexion" in her back. *Id.* Dr. Allred's assessment was that Plaintiff had back pain from "questionable herniated disc v. possible degenerative type disc disease," as well as vertigo, peptic ulcer disease, and obesity. *Id.*

17

On December 30, 1997, Dr. Joseph A. Payant treated Plaintiff for "pain on the right side from her back around to her waist, into the left elbow." TR 250-252. Upon physical examination, Dr. Payant noted that Plaintiff had "full range of motion in all of her joints." TR 250. Dr. Payant diagnosed Plaintiff with, "[n]on-specific right sided myalgia, status post fall," and he prescribed Nalfon and Darvocet. *Id.*

On January 8, 1998, Plaintiff was involved in another MVA (TR 330), and was admitted to Fentress County General Hospital for 23-hour observation for neck pain and a possible "C-5" fracture. TR 243-244; 247. Dr. Payant ordered an x-ray and CT scan of Plaintiff's spine, noting that "there is probably a fracture in the anterior aspect of the C5 vertebral body." TR 245-249.

The following day, on January 9, 1998, Plaintiff went to University of Tennessee Memorial Hospital for a full physical examination and CT scan of the spine, the results of which revealed, "no fractures, sublumations [*sic*], or other acute bony injuries."[24] TR 224-235. Plaintiff returned to urgent care at Fentress County General Hospital on January 10, 1998, because she was "hurting all over"; Dr. Payant assessed Plaintiff's condition as "[c]ontusions status post MVA." TR 240-242.

On January 15, 1998, Dr. Smith ordered an x-ray of Plaintiff's right breast, which revealed a "[l]obulated lesion with associated microcalcifications within the upper outer right breast," and he noted that the "calcifications appear to be increasing over time." TR 236-239. Dr. Smith suggested a six-month follow-up examination. TR 236-239.

On January 28, 1998, Dr. Vaughn N. Barnard Jr. issued a letter to Dr. Smith concerning Plaintiff's January 15, 1998 mammography. TR 236. Dr. Barnard stated that Plaintiff should

---

[24]One document in this series of records is mistakenly dated "1/9/97" (TR 229) instead of "1/9/98."

18

"follow this area closely over the next several months" and "return in three months for a routine breast exam." *Id.*

On January 29, 1998, Dr. Smith treated Plaintiff for complaints of neck pain. TR 330. Dr. Smith noted Plaintiff's January MVA, and his physical examination revealed that Plaintiff experienced "pain on flexion, extension and lateral rotation of neck, worse [*sic*] on hyper extension." *Id.* Dr. Smith prescribed "Garamycin," and "Kenalog." *Id.*

On July 27, 1998, Dr. Hamsaveni Kambam completed an RFC (Physical) of Plaintiff. TR 306- 313. Dr. Kambam found that Plaintiff could "[o]ccasionally lift and/or carry" 50 pounds, and "[f]requently lift and/or carry" 25 pounds (TR 307), but he noted that he might adjust the weight allowance in response to her pain (TR 313). Dr. Kambam also found that Plaintiff could "[f]requently" climb, balance, stoop, kneel, crouch, and crawl.[25] TR 308.

On November 24, 1998, Dr. Charles Heikkenen treated Plaintiff for "left arthritic knee pain."[26] TR 314. Dr. Heikkenen's physical examination revealed "[n]o flank tenderness." *Id.* Dr. Heikkenen ordered an urinalysis, which revealed "[s]pecific gravity 1.005, with 1+." *Id.* Dr. Heikkenen prescribed Garamycin, Kenalog, Bactrim, and Pyridium. *Id.*

In March 1999, Dr. Heikkenen's associate, Dr. Clapp, referred Plaintiff to Dr. Scott A. Copeland because of Plaintiff's "abnormal or suspicious mammogram." TR 354-355. After corresponding with Dr. Clapp and ordering tests, Dr. Copeland concluded in September 1999 that there was "[n]o evidence of malignancy." TR 352-353.

_____

[25]Dr. Kambam reported that there were no treating or examining source statements regarding physical capacities in the file (TR 212), but referenced Plaintiff's January 1998 MVA, mild degenerative changes in the spine, and back strain (TR 313).

[26]The nursing assessment notes from January 29, 1998 to November 24, 1998 contain several references to Plaintiff's leg and back pain. TR 329-330.

19

On May 7, 1999, Dr. Heikkenen treated Plaintiff for her complaint of "some pain off and on" following her January MVA.[27]  TR 356.  Upon physical examination, Dr. Heikkenen found that Plaintiff had "[m]usculoskeletal pain, back of neck."  *Id.*  Dr. Heikkenen opined that Plaintiff's pain was "a combination o [*sic*] her allergies as well as some diffuse musculoskeletal pain," and he prescribed Bicillin, Vancenase, and Motrin.  TR 356.

On September 1, 1999, Dr. Heikkenen diagnosed Plaintiff's arthritis pain as "osteoarthritis, rather severe."  TR 356.  Dr. Heikkenen refilled Plaintiff's "regular" medications and "gave [a] Kenalog injection."  *Id.*[28]

## B.  Plaintiff's Testimony on January 11, 1999

Plaintiff was born on January 14, 1951, and has a eighth grade education.  TR 450.  Plaintiff reported at the hearing that she was five feet, eight inches tall and weighed 225 pounds.  *Id.*  The ALJ asked Plaintiff if her doctor had addressed her weight problem, and she responded: "He just says watch what I eat and not each so much salt."  TR 451.  Plaintiff testified that she did not know why she had gained 75 pounds since the onset of her medical problems, and she claimed that she was not eating large amounts of food.  *Id.*

Plaintiff reported that she did not have an income, and that she received $270 per month in food stamps.  TR 451.  Plaintiff testified that she had last worked in the 1990's, but that she did not remember the specific year in which she stopped working.  *Id.*  Plaintiff recalled that she

---

[27]These nursing assessment records (TR 359) and notes from Dr. Heikkenen (TR 357) state that the automobile accident occurred in January 1999.  The Court notes, however, that there is no other reference in the record to an accident in January 1999, but there are repeated references to a January 1998 accident.

[28]There are no additional treatment notes from the September 1, 1999 treatment record; there is no indication of Plaintiff's complaints, a physical examination, or laboratory work.  TR 356.

Case 2:02-cv-00016   Document 28   Filed 04/12/06   Page 20 of 41 PageID #: 22

had worked as a lunch server for the Memphis County Board of Education in 1993. TR 452.

Plaintiff's attorney asked Plaintiff why she had not returned to work, and she responded: "My back and legs just hurt so bad I can't hardly stand it [*sic*]." TR 452. Plaintiff testified about her leg, back, and neck pain; she stated that her automobile accident in 1973 had affected her left leg, "[a]nd then this disc is not right in my back, according to Jack Smith. And then that car wreck last January's got my neck, it gives me a lot of trouble." *Id.*

Plaintiff testified that she had stopped working in 1991 because she had a miscarriage, and stated, "it seems like my health just kept getting worser [*sic*], and I don't know. My legs would hurt and -- I don't know, I just stays [*sic*] in pain all the times like." TR 453. Plaintiff also reported that she experienced pain in her left breast and under her left arm. *Id.*

Plaintiff's attorney questioned Plaintiff about her January 1998 automobile accident, and Plaintiff asserted that she began to have problems in her neck following this accident.[29] TR 452; 454. Plaintiff testified that the pain started in her neck, made it difficult for her to turn her head to either side, and eventually caused headaches. TR 454. Plaintiff testified, however, that she had experienced migraines before the accident. *Id.* She recalled that she had gone to University of Tennessee Memorial Hospital (UT) after her 1998 accident, but that she had not seen any other specialists about her neck pain. *Id.* Plaintiff also testified that she had not seen any doctors besides Dr. Smith and his associates for her lower back and leg pain. TR 455. Plaintiff recounted the medications and injections that she took to alleviate her pain, and noted that she had not undergone therapy for her neck pain. TR 456.

Plaintiff testified about the extent of her neck pain, stating that it worsened if she sat or

---

[29]The ALJ questioned Plaintiff about this accident, and established that a lawsuit was pending at the time of the hearing. TR 464-465.

Case 2:02-cv-00016   Document 28   Filed 04/12/06   Page 21 of 41 PageID #: 23

stood in particular positions. TR 456. Plaintiff stated that her neck pain extended into her head, and exacerbated her frequent headache pain. TR 457. Plaintiff, however, distinguished between her headache pain, which she described as "pounding," and her neck pain, which "shoots up pain into my head [*sic*]." TR 457-458. Plaintiff reported that her medication provided her with temporary relief. TR 458.

Plaintiff testified that her lower back pain felt like "something heavy laying on it sometimes," and that she could not do dishes without sitting down. TR 459. Plaintiff stated that her back pain worsened while she was sitting, and that she could sometimes sit through a 30-minute television program, but not an hour-long program. *Id.* Additionally, Plaintiff testified that she could lift 10 or 15 pounds; could do some grocery shopping; could drive; did not vacuum; sometimes did laundry; and could do light housework such as washing dishes and dusting, but that she relied upon her daughter for other housework. TR 460-461.

Plaintiff testified that she had difficulty going up and down stairs, explaining that her "left leg don't want to bend [*sic*]." TR 461. Plaintiff stated that she did not work in her yard, but that her brother had worked in the yard for her. TR 461-462. Additionally, Plaintiff stated that she did not go to church more than "[v]ery occasionally," and that she did not do activities outside the home or have any hobbies. TR 462. Plaintiff testified that she spent time outside of her home with her daughter, but that she did not participate in activities with her daughter. *Id.* Plaintiff stated that she left the television on "all day," and that she sometimes had difficulty following the programs because of her headaches. TR 463. To alleviate her headaches, Plaintiff testified that she placed something over her eyes to keep out the light, or used a heating pad. *Id.* Plaintiff also testified that she had difficulty sleeping because of pain in her back, legs, and toes.

22

TR 463-464.  Plaintiff asserted that she could not walk for longer than 10 minutes without feeling "out of breath."  TR 464.

### C.  Vocational Testimony on January 11, 1999

Vocational expert ("VE"), Patsy Bramlett,[30] also testified at Plaintiff's hearing.  TR 445. The VE classified Plaintiff's past relevant jobs as a packer, sewing machine operator, button machine operator, and tack machine operator, as "light" and "unskilled."  TR 466-467.  The VE stated that Plaintiff's past relevant work as a fusing machine operator was "medium" and "unskilled."  TR 466.  Additionally, the VE testified that Plaintiff did not acquire any transferrable skills.  TR 467.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff, including Plaintiff's age, education, and occupational background, and asked if the hypothetical claimant would be able to perform any sedentary and light jobs.  TR 467.  The VE answered that the hypothetical claimant could perform light jobs that include assembler, hand packager, and parts sorter.  *Id.*  The VE opined that in the State of Tennessee, there were approximately 4,000 jobs as an assembler, 2,000 jobs as a hand packager, and 1,500 jobs as a parts sorter, all of which would be appropriate for the hypothetical claimant.  *Id.*  In addition to these positions, the VE testified that there were numerous other positions at the sedentary level that would be appropriate for the hypothetical claimant, including 2,000 jobs as a sedentary assembler, 1,000 jobs as a sedentary packager/bagger, and 800 jobs as a sedentary parts sorter.  *Id.*

### D.  Plaintiff's Testimony on December 2, 1999

Plaintiff testified that she had not received any special job training, nor had she been

---

[30]The VE's name is misspelled as Patsy Branlett.  TR 445.

involved with any vocational rehabilitation.  TR 414.  Plaintiff stated that she could write, but that she had difficulty spelling.  *Id.*  When asked if she could read, Plaintiff responded: "If the words ain't too big, I can."  TR 415.  Plaintiff testified that she could count money, that she had a driver's license, that she was right-handed, and that she had been approved for "Ten care [*sic*]."  *Id.*

Plaintiff testified that she lived with her husband and daughter (TR 415), and that her husband did not work because of his disability (TR 416).  Plaintiff stated that food stamps and her daughter's income provided income for the household.  *Id.*

Plaintiff testified that she had been in an automobile accident in January 1998, for which a lawsuit was pending.  TR 416.  Plaintiff maintained that her medical conditions had worsened after the accident, stating: "Well, they thought my neck was broke.  I think that's what made my neck worser [*sic*], but the other pain was already there."  *Id.*

Plaintiff stated that she had not sought employment since January of 1994 because of pain in her back and legs.  TR 416.  Plaintiff testified about her last full-time job, in the 1990s, but could not recall the specific year that she had stopped working.  *Id.*  Plaintiff also testified that she had applied for disability benefits before this application.  TR 417.

Additionally, Plaintiff testified that Dr. Allred[31] had been her primary care physician until she switched to Dr. Smith and his associates.  TR 418.  She stated that, at the time of the hearing, Dr. Smith was treating her for her arthritis and nerves; he gave her Cortisone shots to alleviate her back and neck pain.  *Id.*  Additionally, Plaintiff testified that Dr. Copeland and other physicians had treated her for the mass in her breast; at the hearing, she stated that this condition

---

[31]The hearing transcript of mistakenly spells Dr. Allred's name "Dr. Alread."  TR 417.

was stable.  *Id.*

Plaintiff testified that, when she saw Dr. Allred in 1994, she had been having problems in her left leg and back.  TR 418.  Plaintiff also testified that her left knee had been injured in a 1973 MVA.  TR 418-419.  Plaintiff also stated: "Well, it hurts worse than a toothache sometimes.  Take medicine and them [*sic*] shots."  TR 419.  For her knee pain, Plaintiff received shots, but she could not remember who had initially given her the shots.  *Id.*  Plaintiff stated that her left knee would swell so that she could not move from her chair.  *Id.*  She reported that she could move down into a squat, but that she would have difficulty getting up again.  *Id.*

Plaintiff testified about her back pain during 1994 (TR 420), stating that she had back pain "three or four days out of the week" (TR 420-421; 424).  Plaintiff asserted that, at the time of the hearing, her back pain occurred more frequently than in 1994.  *Id.*  She described her pain as a "nagging kind of feeling" for which she took pain medication and muscle relaxers that provided her relief for a "couple of hours."  TR 421.  Plaintiff later testified that nothing completely alleviated her pain, but subsequently described how her medication helped temporarily: "It just eases it for a little while and then when it wears off, you have to take another one."  TR 424.

Plaintiff testified that she could not sit for more than 10 or 15 minutes without having difficulty when she stood to walk.  TR 421.  Plaintiff asserted that she could not exercise without experiencing back and leg pain, and that she could only lift five or 10 pounds.  TR 422.  Plaintiff stated that she had not used any kind of therapy to alleviate her conditions, and she acknowledged that she had not seen an arthritis specialist.  *Id.*  Additionally, Plaintiff asserted that she took medication for her emotional problems, stating, "I've been on nerve pills, I guess

15 or 20 years or longer."  TR 423.

Plaintiff testified that she had numbness in her left leg and hip, but that this did not affect her in the same way as the pain in her legs and back.  TR 426.  Plaintiff testified that she underwent cataract surgery, and stated that her physicians had informed her that: "Cortisone shots bring on the cataracts."  *Id.*

Plaintiff testified about her daily activities, stating that she did light housework such as dusting, but that her daughter helped her with "heavy" chores.  TR 427.  She testified that she sometimes spent all day sitting in her recliner, but that on a "good day" she spent her day in both her recliner and her rocking chair.  *Id.*  Plaintiff stated that she did some of the grocery shopping, and that her daughter did some as well.  TR 428.  Plaintiff asserted that she did not have hobbies, that she did not socialize with other people, but that she used to have hobbies and socialize before her illness.  *Id.*  Additionally, Plaintiff testified that she was not involved in any outside activities, clubs or organizations; that she had stopped going to school-related events when her daughter graduated from high school (TR 430); that she watched television, but had difficulty following what happened; and that she did not read; nor did she go to movies or restaurants (TR 428-429).  When Plaintiff's attorney asked whether Plaintiff had any difficulty with a loss of energy or a loss of interest in activities, Plaintiff answered in the affirmative; she stated that she started noticing such changes "[i]n the last three or four years I guess."  TR 430.

Plaintiff recounted her automobile accident from January 8, 1998, after which her neck condition had worsened.  TR 430-431.  Plaintiff testified that she used a heating pad to help with her pain, but that she could not raise her right arm higher than her shoulder.  TR 431.  Plaintiff also asserted that she had problems moving her head and neck when driving.  TR 433.

26

Plaintiff testified that she had experienced migraine headaches that would last for five to seven days. TR 433. She also stated that she experienced migraine headaches weekly. *Id.* Plaintiff testified that Dr. Smith had given her medication for her headaches, but that she had not been referred to a headache specialist. TR 434. Plaintiff also reported that she had experienced chest pain on one occasion, and had been hospitalized. *Id.* After further testimony from the VE, the record was closed, but it was reopened to allow Plaintiff to state that Dr. Smith had given her shots at the base of her skull for her headaches. TR 444.

### E. Vocational Testimony on December 2, 1999

Vocational expert ("VE"), Rebecca Williams, also testified at Plaintiff's hearing. TR 413-414; 435-443. The VE noted that Plaintiff's relevant past relevant work in the garment industry included the following tasks: pressing work, fusing work, operating sewing machines, operating button and snap machines, operating rivet machines, and packing (which referred to shipping and receiving). TR 413-414. The VE characterized all of these jobs as "light" and "unskilled" work. TR 413.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 435. The ALJ asked the VE to assume Plaintiff's age, education, and past relevant work experience. *Id.* The ALJ inquired whether such a hypothetical claimant with the ability to perform light work could perform any of Plaintiff's past relevant work. *Id.* The VE answered that the hypothetical claimant could perform the same past relevant work. *Id.*

The ALJ then modified the hypothetical to include the following limitations: the ability to occasionally perform postural activities such as climbing, balancing, stopping, crouching,

kneeling, and crawling.  TR 435.  The VE responded that a hypothetical claimant with such limitations would be able to perform all of Plaintiff's past relevant work, except for the packing job.  *Id.*

The ALJ further manipulated the hypothetical, positing that the hypothetical claimant could not stand and walk for more than two hours.  TR 435.  The VE responded that the hypothetical claimant could perform all of Plaintiff's past relevant work, except for the positions as presser and fuser.  TR 435-436.

The ALJ next limited the use of the hypothetical claimant's dominant (right) arm to occasional reaching, pushing, and pulling.  TR 436.  Assuming this limitation, the VE responded that none of Plaintiff's past relevant work would be available.  *Id.*

The ALJ then asked the VE whether there were other jobs available for a hypothetical claimant with all of the aforementioned limitations.  TR 436.  The VE opined that in the State of Tennessee, there were approximately 500 positions available as a security guard, and 200 positions available as a parking lot attendant, both of which would be appropriate for the hypothetical claimant.[32]  *Id.*  In addition to the security guard and parking lot attendant positions, the VE testified that there were numerous other positions that would be appropriate for the hypothetical claimant, including 3,000 positions as a sedentary cashier and 500 positions as a sedentary inspector.  *Id.*

The ALJ asked the VE whether the availability of the stated jobs would be affected if such a hypothetical claimant was functionally illiterate.  TR 437.  The VE responded that the type of positions available would be "inspecting types of jobs where the non-dominant arm can

---

[32]The VE stated that this assessment also assumed occasional neck movements.  TR 437.

be the primary working arm." *Id.*

The ALJ again modified the hypothetical to include the restriction of light work with only occasional postural activities. TR 437. The VE responded that the hand packager positions would not be available, but that the assembler positions would be available at both the light and sedentary levels. *Id.* The VE opined that there were approximately 8,000 light assembly jobs, and 4,000 sedentary assembly jobs, which would be appropriate for the hypothetical claimant. TR 437-438. Additionally, the VE stated that there were approximately 1,500 parts sorter jobs at the light level, and 700 parts sorter jobs at the sedentary level that would be available. TR 438. The ALJ asked how the limitations of walking or standing up to two hours a day would affect the availability of the stated positions. *Id.* The VE responded that the sedentary jobs would still remain, and that 1,200 of the assembly jobs would offer a sit/stand option, and therefore also remain available. *Id.*

The ALJ asked how occasionally limiting the hypothetical claimant's use of the right arm and neck movements would affect the availability of the parts sorter positions. TR 438. The VE opined that 500 parts sorter positions would remain available. TR 439.

The ALJ further modified the hypothetical, adding the following limitations: illiteracy; mild loss of concentration, persistence or pace; moderate loss of concentration, persistence, or pace; severe marked loss of concentration, persistence, or pace; and lying down during the work day for non-medical reasons. TR 439. The VE responded that a "moderate loss in concentration, persistence, or pace" would eliminate the light jobs and make only the non-cashier, sedentary jobs available. *Id.* The VE added that a "severe marked loss of concentration, persistence, or pace" and "lying down for non-medical reasons" would eliminate the availability

29

of all jobs.  *Id.*

Finally, the ALJ asked what impact it would have on the positions available if Plaintiff's testimony was fully credible; the VE responded that no jobs would be available.  TR 440.

Plaintiff's attorney then posited a hypothetical with the limitations contained in Dr. Allred's January 1994 medical assessment, namely, that the hypothetical claimant could occasionally lift 20 pounds; could stand less than two hours in an eight-hour workday; and could sit for less than six hours.  TR 441.  The VE responded that, if this meant that Plaintiff could not work on a full-time basis, then no positions would be available, but that if Plaintiff could work full-time, then the sedentary assembly positions, cashiering positions, and inspecting positions would remain available.  *Id.*

Following this inquiry, the ALJ asked the VE to specify which of the following light jobs had a sit/stand option at will: security guard, parking lot attendant, cashier, and inspector.  TR 442.  The VE responded that there were approximately 700 jobs, in each of the categories, with such an option.  *Id.*

### III.  CONCLUSIONS OF LAW

#### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept

30

as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).


### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any

31

medically determinable physical or mental impairment which could be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[33] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform,

---

[33]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff essentially contends that the ALJ erred by 1) not giving controlling weight to the testimony of Plaintiff's treating physician and consultative physician in assessing Plaintiff to have the ability to work at the "light" exertional level and 2) by finding that Plaintiff had the ability to work at the "light" exertional level.   Docket Entry No. 21.  Accordingly, Plaintiff

33

maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed.

*Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or
> reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can

be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is

overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery

v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and

immediately award benefits if all essential factual issues have been resolved and the record

adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171,

176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1.  Weight Accorded to Opinion of Plaintiff's Treating Physician

Plaintiff argues that the ALJ erred by rejecting the opinion of her treating physician and

consultative physician concerning her ability to perform at a "light" level of exertion.  Docket

Entry No. 21.  The ALJ stated that he did not grant full credibility to the DHS physicals from

Plaintiff's treating physician, Dr. J.D. Allred, or to the consultative examination by Dr. Sven

Spjuth.  TR 20.

With regard to the evaluation of medical evidence, the Code of Federal Regulations

states:

> Regardless of its source, we will evaluate every medical opinion we

34

receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...

(3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

...

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

35

20 C.F.R. § 404.1502.

**a. Treatment Relationship**

When the opinions of treating physicians are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

In the case at bar, Plaintiff had two treating physicians, Dr. Jonathan Allred and Dr. Jack Smith. Plaintiff testified that Dr. Smith became her treating physician after Dr. Allred. TR 418. The record shows that Plaintiff received treatment from Dr. Allred from February 8, 1992 to August 28, 1997 (TR 5), and from Dr. Smith and his associates from November 8, 1993 to November 24, 1998 (TR 5). The ALJ properly articulated his rationale for finding more support and consistency in the record of treating physician, Dr. Smith, and other physicians, instead of Dr. Allred. TR 20. In his opinion, the ALJ specifically stated that he did not find that Dr. Allred's assessment had support in the record; he cited, *inter alia*, cervical spine x-rays and CT scans that were "negative for any cervical fracture." TR 20. Additionally, the ALJ recounted many other sources in support of his position, including a detailed discussion of Dr. Smith's findings. TR 19. The ALJ explicitly stated that he did not give Dr. Allred's opinion controlling weight and cited specific findings of another treating physician, Dr. Smith, to support his position. As such, the Regulations do not mandate that the ALJ accord Dr. Allred's evaluation controlling weight. Accordingly, Plaintiff's argument fails.

In addition, the opinion of a consulting physician is not entitled to the deference due the opinion of a treating physician. *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). Dr. Smith was Plaintiff's treating physician, as stated above, while Dr. Spjuth was a consultative physician

36

for Plaintiff on October 5, 1994. TR 612-618. The ALJ did not err in giving Dr. Smith's treating opinion more weight than Dr. Spjuth's consultative opinion. Therefore, this claim also fails.

**b. Supportability and Consistency**

As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* Notwithstanding the aforementioned discussion of how the ALJ is entitled to weigh inconsistencies between two treating physicians, the ALJ could also choose not to fully accredit Dr. Allred's opinion based upon other factors listed above.

Dr. Allred treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to other non-treating physician's opinions. TR 590-610. The record contains a series of medical treatment records from Dr. Allred, dating from at least June 1990, if not earlier. *Id.* Additionally, Dr. Allred completed DHS physicals on December 16, 1993; December 21, 1993; June 3, 1997; January 25, 1994; and August 28, 1997.[34] As has been noted, however, Dr. Allred's opinion contradicts other substantial evidence in the record. TR 20.

_____

[34]Dr. Allred evaluated Plaintiff on December 16, 1993, but said that he could not assess Plaintiff on any of the applicable criteria. TR 597-598. For the December 21, 1993 evaluations, Dr. Allred indicated no limitations (TR 595-596), and Plaintiff's June 3, 1997 physical was postponed because of Plaintiff's chest pain. TR 210. On January 25, 1994, Dr. Allred found that Plaintiff had a decreased range-of-motion in many areas, as well as arthritis. TR 211. On August 28, 1997, Dr. Allred's found that Plaintiff had back pain, vertigo, peptic ulcer disease, and obesity. TR 209.

37

In his decision, the ALJ discussed x-rays and CT scans (TR 18-19), Dr. Johnson's consultation (TR 18-19), Dr. Smith's treatment (TR 19), Dr. Killian's psychological evaluation (TR 19), Dr. Copeland's evaluation (TR 20), Dr. Heikkenen's treatment (TR 20), and the RFC evaluations. TR 20. After his discussion of these various medical records, the ALJ stated that he did not find that the medical evidence supported Dr. Allred's and Dr. Spjuth's opinions about Plaintiff's conditions. TR 20.

Specifically, the ALJ discussed an x-ray from Fentress County General Hospital, dated December 30, 1995, which revealed "moderate degenerative disc disease." TR 18. Also, the ALJ recounted Dr. Johnson's evaluations of a lumbar spine x-ray,[35] from which Dr. Johnson concluded that Plaintiff should be able to lift/carry 20 pounds occasionally and 10 pounds frequently, and should be able to sit, stand, and walk for six hours. TR 19. Further, the ALJ discussed two CT scans performed at University of Tennessee Memorial Hospital, which revealed no abnormalities, and "full range of motion in all extremities." TR 19.

Additionally, the ALJ reviewed medical evidence from Dr. Smith, who became Plaintiff's treating physician after Dr. Allred. TR 19, 418. The ALJ noted that Dr. Smith found Plaintiff to have full range of motion of the shoulder, good range of motion in the back, and generalized joint swelling with pain, but no evidence of inflammatory arthritis. TR 19. The ALJ mentioned Dr. Copeland's statement that Plaintiff seemed to be in her "usual state of good health." TR 20. The ALJ also referenced a mental health evaluation that revealed a depressive disorder, developmental reading disorder, and mathematics disorder, none of which interfered

---

[35]The ALJ, in his decision, discussed an x-ray of Plaintiff's lumbar spine, which revealed "congenital fusion" at one level, but indicated that other spaces, joints, etc., were within "normal" limits  TR 18-19.

Case 2:02-cv-00016   Document 28   Filed 04/12/06   Page 38 of 41 PageID #: 40

with simple, daily routines.  TR 19.

The ALJ appropriately weighed the contradictory evidence of the treating physician, Dr. Allred, against the other medical evidence in the record.  The ALJ considered the consultations, evaluations, and other medical records to determine the supportability and consistency of Dr. Allred's opinion.  Using the factors enumerated in the regulations, the ALJ appropriately used his discretion not to give full credibility to Dr. Allred' s opinion.  Therefore, Plaintiff's claim fails.

## 2.  Substantial Evidence

Plaintiff contends that the ALJ erred by finding that Plaintiff could perform "light" exertional activities.  Docket Entry No. 21.  Essentially, Plaintiff asserts not only that the ALJ inappropriately disregarded the treating and consultative physicians' opinions about Plaintiff's exertional level (*supra*), but also that the ALJ did not base this determination on substantial evidence.  *Id.*

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

The record is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence."  In his decision, the ALJ explicitly discussed the testimony of both Plaintiff (TR 18, 22) and the VE (TR 20-21).  The ALJ recounted Plaintiff's testimony about her automobile

39

accident in 1998 and how it allegedly affected her back, neck, shoulder, and arm pain. TR 18.
The ALJ also described why he did not fully credit Plaintiff's subjective complaints of pain: he
mentioned Plaintiff's complaints, numerous diagnostic tests and medical records, as well as
Plaintiff's self-reported treatment and daily activities. TR 22. Additionally, the ALJ explained
what constituted "light" work, and explicitly stated that he relied on the VE's testimony to
determine the type of work appropriate for Plaintiff. TR 21-22. While it is true that some of the
testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of
the evidence supports the ALJ's determination that Plaintiff had the following RFC: "light
exertional level with occasional postural activities, mild loss of ability to sustain concentration,
persistence, and pace due to pain, and illiterate [*sic*]." TR 20.

As has been noted, the reviewing court does not substitute its findings for those of the
Commissioner if substantial evidence supports the Commissioner's findings and inferences.
*Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion,
the decision of the Administrative Law Judge must stand if substantial evidence supports the
conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was
properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for
Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner
be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days
from receipt of this Report and Recommendation in which to file any written objections to it

Case 2:02-cv-00016   Document 28   Filed 04/12/06   Page 40 of 41 PageID #: 42

with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge
